Filed 1/10/22  P. v. Solorzano-Garcia CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>            v.<br><br>NELSON EDUARDO SOLORZANO-GARCIA,<br><br>      Defendant and Appellant. | G058552<br><br>(Super. Ct. No. 18CF1208)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Jonathan S. Fish, Judge.  Affirmed with directions.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Nelson Eduardo Solorzano-Garcia (Solorzano) appeals from the judgment after a jury convicted him of committing a lewd and lascivious act on his four-year-old daughter G.G., having sexual intercourse with her, and engaging in oral copulation. On appeal, Solorzano contends: (1) the trial court erred in finding G.G. was competent to testify; (2) statements he made to the police were involuntary as they resulted from police coercion and implied promises of leniency; (3) his trial counsel rendered ineffective assistance by failing to seek suppression of these involuntary statements; (4) the prosecutor erred during her closing argument by misstating the law concerning the mens rea element of the sexual intercourse and oral copulation offenses; and (5) clerical errors in the sentencing minute order and abstract of judgment must be corrected. We direct the trial court to correct the clerical errors. In all other respects, we affirm the judgment.

FACTS

I. *Background*

Solorzano moved to the United States with his daughter G.G. when she was about three years old. G.G.'s mother (Mother) was supposed to follow them but did not. After Solorzano and G.G. had been in the country a few months, Mother wanted him to send G.G. back to her, but he refused. Solorzano told Mother he would not take away G.G.'s future and send her back to the dangerous place from which they escaped.

Solorzano and G.G. lived in a couple of different cities. He found it difficult to find work and care for G.G. When G.G. was about three and one-half years old, Mother arranged for her aunt (Auntie) to provide childcare. Solorzano and G.G. moved to Santa Ana so Auntie could take care of G.G. Solorzano got a job and a place to live.

While Solorzano worked, G.G. would stay at Auntie's house four to six continuous days. On Solorzano's days off, he would pick up G.G. and take her to his residence for two days. There, they would sleep in the same bed. G.G. followed this

2

routine for about three months, and during this time, Auntie became a second mother to her.

Auntie knew Mother wanted G.G. back. At first she offered to help Mother, but after taking care of G.G. for two months, Auntie told Mother she wanted custody of G.G. herself. Auntie asked Solorzano to give her custody of G.G. so she could take G.G. to school or the doctor. Neither Solorzano nor Mother agreed to give Auntie custody of G.G.

II. *G.G. Makes Accusations Against Solorzano*

A few days before G.G.'s fourth birthday, she told Auntie about Solorzano inappropriately touching her private parts. G.G. complained her private parts burned and described Solorzano having sexual intercourse with her. Initially, Auntie thought G.G. was lying. But when she bathed G.G., she noticed some "waste" in G.G.'s underwear and decided to retain the underwear. Auntie informed Solorzano of G.G.'s allegations and told him to take G.G. to the doctor because she might have a urinary tract infection. Solorzano responded G.G. was "crazy."

Auntie took G.G. to the police about 10 days later, after Auntie talked to her about it again and G.G. was very convincing. She told G.G. to tell the police the truth, but she did not specifically tell G.G. what to say. Officer Maria Alvarez interviewed G.G. and Auntie at the police station. Auntie gave the police two pairs of G.G.'s underwear she had collected.

Alvarez took G.G. and Auntie to a local hospital, where a forensic nurse conducted a sexual assault examination of G.G. G.G. had a normal hymen with a smooth rim and no visible injuries. Given these findings, the nurse could neither confirm nor negate sexual abuse. The nurse obtained a buccal swab from G.G. and swabbed several parts of her body for DNA testing, including G.G.'s stomach, inner thighs, mons pubis, anus, vulvar, and vestibule. After the examination, G.G. was taken to the Orangewood Children and Family Center.

III. *Solorzano's Police Interviews*

An officer arrested and interviewed Solorzano. In the interview, Solorzano denied any inappropriate contact between himself and G.G. The next day, Detectives Gerardo Corona and Joanna Perez reinterviewed Solorzano at the men's central jail because Corona wanted to obtain more information. The interview was conducted in Spanish, Solorzano's native language. Solorzano stated the arresting officer told him that G.G. had accused her "papá" of touching her or kissing her private parts. Solorzano denied the allegations and denied G.G. called him "papá." He told Corona that G.G. called him "bebe" (baby), not "papa," and he had informed the arresting officer those were not his daughter's words.

When asked if he accidentally touched G.G. inappropriately, Solorzano responded affirmatively. He described two times when he might have touched G.G.'s vaginal area. One time occurred when he was playing with G.G. Solorzano explained he often played with G.G. by grabbing and squeezing her buttocks and asking her "mami, de quien es este [c]ulito?" (mommy, whose little ass is this?). Once when he did this, it felt like he touched G.G.'s vaginal area, and G.G. told him it hurt.

Solorzano described another time when he was helping G.G. clean herself. He explained G.G. had been with him for three days and had not showered because it was cold. Solorzano said he cleaned G.G.'s buttocks and vaginal area with wet wipes but did not otherwise touch her. Corona told Solorzano helping G.G. clean herself was not touching her inappropriately, and he pushed Solorzano to explain how he touched her inappropriately.

Later in the interview, Solorzano said he touched G.G. when he checked her and cleaned her, but he denied putting his mouth on her "part." He said G.G. was lying when she said he did so. Using a ruse, Corona told Solorzano they had found his saliva on G.G. and asked Solorzano to explain why it was on her. Solorzano responded he had no idea. After Corona repeatedly told Solorzano they found his saliva on G.G.'s

4

vaginal area, Solorzano admitted he kissed G.G. and stated, "it was a fucking mistake." He repeated the story about G.G. not showering for three days while she was staying with him. He said when G.G. came back from the bathroom she told him it hurt when she peed, so he used the wet wipes to clean her. When he cleaned her, he kissed her vaginal area as a type of affection. He did not have lewd intent or intend to hurt her, but he accepted he made a mistake in kissing her.

At points during the interview, Solorzano stated he felt very bad, was ashamed, and believed he hurt G.G. He said it would be good for him to talk to a counselor. He also said it was possible G.G. came onto him. When asked to explain, he only stated G.G. would go through his cell phone sometimes.

IV. *G.G.'s Interview*

After interviewing Solorzano, Corona attended the social worker's interview of G.G. at the Child Abuse Services Team (CAST) facility. At the beginning of the interview, the social worker explained to four-year-old G.G. that she should only say things that are true while they were talking. The social worker tested G.G.'s understanding of the difference between true and not true statements. G.G.'s answers reflected she understood the difference and G.G. promised to tell the truth.

When asked what happened, G.G. responded her "daddy threw milk here" and pointed to her crotch area. She indicated her father had milk that came from his crotch; she did not know what his part was called. Using two teddy bears to demonstrate, G.G. explained at night, her father took off her clothes and his, lied on top of her, and went "tun, tun, tun." When he did that, it felt bad and hurt. G.G. asked him what he was doing, and he said nothing. G.G. would tell herself to go to sleep.

G.G. used a teddy bear to show the social worker the area where her father put his penis between her legs. She did not know what the part between her legs was called; she called it "toto." She said her "toto" hurt and bled but did not hurt at the time of the interview.

5

Again using the teddy bears, G.G. demonstrated her father would spit between her legs, raise her legs, and get on top of her. G.G. said he weighed a lot and it felt bad. She also demonstrated him putting his legs around hers and holding her hand with his hand. She said her father did something to her buttocks and it hurt, but she did not know what he did. G.G. complained her mouth hurt and her father did something to her mouth, but she could not explain what.

G.G. indicated her father did "tun, tun, tun" one time, put her legs up and was on top of her one time, and spit between her legs many times. She said he kissed her on the mouth, cheeks, and neck many times. Throughout the interview, G.G. referred to Solorzano as "papi" and said he called her "mami."

V. *Forensics*

The swabs taken during G.G.'s sexual assault examination and the two pairs of her underwear were submitted to the Orange County Crime Lab for forensic analysis. A forensic scientist tested each swab for acid phosphatase, an enzyme found in high concentrations in seminal fluid. It was only a presumptive test because the enzyme is also found in lower concentrations in other biological fluids. The acid phosphatase enzyme was detected on the swabs taken of G.G.'s vestibule, vulva, external anal, stomach, and buccal. The scientist then used a microscope to examine portions of these swabs. She found three spermatozoa (sperm cells) on one of the swabs of G.G.'s vestibule and submitted the swab for DNA extraction and analysis.

All of the swabs were also tested for amylase, an enzyme found in high concentrations in saliva and found in lower concentrations in urine and other biological fluids. Low levels of amylase were detected on the swabs taken of G.G.'s vulva, mons pubis, and her inner thighs.

G.G.'s underwear was also tested. No seminal fluid or spermatozoa were detected on either pair. One pair of underwear was positive for amylase, so the scientist excised a portion of it and submitted it to another part of the lab for DNA extraction.

6

A forensic scientist in the lab's DNA section analyzed two swabs of G.G.'s vestibule. A differential extraction was performed on both swabs, splitting the sperm fraction from the non-sperm fraction. In the non-sperm fraction of both swabs, there was no DNA foreign to G.G. The sperm fraction in one swab "had such a low DNA quant" it was not suitable for DNA typing. DNA typing was attempted on the sperm fraction in the second swab, even though the quantitation was low. The lab obtained a low-level partial profile, but it was insufficient for comparison. No DNA foreign to G.G. was detected in the vulva or mons pubis swabs or on her underwear.

VI. *Charges and Trial Proceedings*

An amended information charged Solorzano with two counts of committing a lewd and lascivious act upon G.G., a child under the age of 14 years (Pen. Code, § 288, subd. (a);[1] count 1 (oral copulation) & count 2 (touching)); two counts of sexual intercourse with a child 10 years of age or younger (§ 288.7, subd. (a); counts 3 & 4); and oral copulation with a child 10 years of age or younger (§ 288.7, subd. (b); count 5). As to count 1, it was further alleged Solorzano engaged in substantial sexual conduct with G.G., a child under the age of 14 years (§ 1203.066, subd. (a)(8)).

Prior to trial, the prosecution filed a motion in limine, arguing Solorzano's statements during his interview with Corona were admissible during its case-in-chief. The defense opposed the motion, asserting Solorzano's statements were obtained in violation of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436. When the trial court inquired whether the defense was also challenging the admissibility of Solorzano's statements on voluntariness grounds, defense counsel affirmed the objection was based only on *Miranda*. After conducting an evidentiary hearing, the court concluded there was no *Miranda* violation and Solorzano's statements were admissible.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

During the trial, the recording of Corona's interview of Solorzano was played for the jury.[2] Corona testified regarding various tactics he used during the interview. He explained he engaged in rapport building in the beginning of the interview. As the interview developed, he challenged what he believed were inconsistent statements by Solorzano. Solorzano repeatedly denied putting his mouth on G.G.'s vagina. To challenge this denial, Corona falsely told Solorzano his saliva had been found there. When Solorzano denied G.G.'s allegations, Corona threatened to go tell G.G. she was a liar, but this was also a ruse. Several times during the interview Corona interrupted Solorzano as he started to answer a question and accused Solorzano of lying. Corona told Solorzano he was giving him an opportunity to tell the truth so Corona could tell the District Attorney Solorzano was honest. In mentioning the District Attorney, Corona was trying to imply he had a way to talk to the District Attorney to make it easier on Solorzano if he stopped maintaining his innocence and said what Corona wanted to hear. Several times during the interview, Corona suggested, "'It was just a mistake,'" telling Solorzano what he wanted him to say. Shortly after Solorzano admitted kissing G.G.'s vagina as a sign of affection when he believed she had a urinary tract infection and saying it was a mistake, Corona ended the interview.

In addition to Corona's testimony, the jury heard testimony, summarized above, from G.G., Auntie, Officer Alvarez, the forensic nurse who conducted G.G.'s sexual assault examination, and two forensic scientists from the crime lab. The jury also saw the video of G.G.'s CAST interview. At the time of trial, Auntie had not seen G.G. in more than two and one-half years since accompanying her to the sexual assault exam.

The forensic nurse testified it is possible for an adult male to engage in sexual intercourse with a child and leave no visible signs of physical injury. The nurse explained it is possible for an adult male to engage in sexual penile penetration of a small

_____

2        As the interview was conducted in Spanish, the jurors were provided transcripts of the interview with English translations.

8

female child and the child have a normal, smooth rim hymen if the penetration is partial and "ever so slight." Although full penetration with no injury is possible, the nurse had not seen it with a child. The nurse also testified a genital injury in a young child could heal over a 10-day period. Addressing vulva coitus, the nurse indicated the absence of any tearing of the hymen or changing of the smooth rim was consistent with this type of penetration. The absence of physical findings during G.G.'s sexual assault exam neither confirmed nor negated vulvar coitus penetration.

At trial, G.G. testified Solorzano touched her private parts, where she went "pee pee" and "poo poo." However, she could not remember the details of what happened. During and after G.G.'s testimony, the defense moved to disqualify her as a witness on the ground she was incapable of understanding her duty to tell the truth. Both times the court denied the motion, finding G.G. understood she had to tell the truth.

The jury found Solorzano guilty of counts 1, 3, and 5 and found true count 1's allegation of substantial sexual conduct. The jury returned not guilty verdicts on counts 2 and 4. The court imposed a total sentence of 40 years to life, comprised of 25 years to life on count 3 and a consecutive term of 15 years to life on count 5. The court imposed a six-year term on count 1 but stayed the sentence under section 654.

## DISCUSSION

I. *G.G.'s Competency to Testify*

Solorzano contends the trial court erred by concluding G.G. was competent to testify and denying his motion to strike her testimony. We disagree.

A. *Applicable Law*

"When a witness's competency to testify . . . is questioned, we start from the general rule that '[e]xcept as otherwise provided by statute, every person, irrespective of age, is qualified to be a witness and no person is disqualified to testify to any matter.' (Evid. Code, § 700.) A person is completely disqualified from testifying under Evidence Code section 701, subdivision (a) if he or she is '(1) [i]ncapable of expressing himself or

9

herself concerning the matter so as to be understood . . . or [¶] (2) [i]ncapable of understanding the duty of a witness to tell the truth.' 'Capacity to communicate, or to understand the duty of truthful testimony, is a preliminary fact to be determined exclusively by the court, the burden of proof is on the party who objects to the proffered witness, and a trial court's determination will be upheld in the absence of a clear abuse of discretion.' [Citation.]" (*People v. Flinner* (2020) 10 Cal.5th 686, 740 (*Flinner*).) "A trial court abuses its judicial discretion when it renders a ruling that is absurd or beyond the bounds of reason, all of the circumstances considered. [Citation.]" (*In re Ana C.* (2012) 204 Cal.App.4th 1317, 1326 (*Ana C.*).)

Solorzano contends the trial court abused its discretion by denying his "motion to disqualify [G.G.] as a witness and strike her testimony because she was incapable of expressing herself concerning the matter so as to be understood and/or she was incapable of understanding her duty as a witness to tell the truth." Because "[t]he issue of a witness's competence largely involves an evaluation and weighing of the evidence concerning the issue" (*Ana C., supra*, 204 Cal.App.4th at p. 1325), we review G.G.'s testimony in detail.

B. *Trial Court Proceedings*

G.G. was six years old when she testified. When she was called to the witness stand, the clerk asked G.G. if she promised to tell "the truth, the whole truth, and nothing but the truth." Initially, G.G. responded she did not understand, but when the clerk repeated the question, G.G. responded affirmatively. The court conducted a brief voir dire of G.G. Among the questions the court asked her was whether she knew the difference between the truth and a lie. After G.G. said she did, the court questioned G.G. further to determine the extent of her understanding, and the following exchange occurred:

"[Court]: Okay. So if I were to say that you are wearing a yellow sweatshirt, would that be the truth or a lie?

10

"[G.G.]: Lie.

"[Court]: If I were to say that you were wearing like a pink sweatshirt with hearts on it, would that be the truth or a lie?

"What color do you think that sweatshirt is? Is it red or pink?

"[G.G.]: Red.

"[Court]: Okay. So if I were to say that you're wearing a red sweatshirt with hearts on it, would that be the truth or a lie?

"[G.G.]: Truth.

"[Court]: Okay. Do you understand the difference between a truth and a lie?

"[G.G.]: A lie.

"[Court:] No. My question is do you know what the difference is between telling the truth and telling a lie? [¶] Do you understand the question?

"[G.G.]: No."

The court informed G.G. the prosecutor and defense counsel were going to ask her questions and "[t]he only thing" she had to do was "tell the truth." The court explained to G.G. if she was asked a question and she did not know the answer, the truthful answer would be "'I don't know'" and if she did not remember something, the truthful answer would be "'I don't remember.'" G.G. indicated she understood. The court cautioned G.G. not to answer questions if she did not know what the truth was and asked G.G. if that made sense. G.G. responded, "I don't remember." The court remarked it sounded like G.G. "kind of" got what the court was saying.

The court explained to G.G. how the interpreter sitting next to her would translate for her, and G.G. indicated she understood. The court informed G.G. she could take a break when she wanted, she just had to let them know she wanted one. The court also advised G.G. to let them know if she did not understand something because they had

11

to make sure she understood everything, and the court asked G.G. if that made sense. When G.G. responded "No", the following exchange occurred:

"[Court]: No? I'm just saying if you ever have a question, just tell us you don't understand. Okay? Because maybe there will be words you don't understand or something like that. Just tell us 'I don't understand.' Okay?

"[G.G.]: I don't remember. I didn't understand.

"[Court]: Okay. So those are the answers you can give."

The court permitted the prosecutor to proceed with her examination of G.G. Early on, the prosecutor reminded G.G. it was "really important" everything G.G. said when "sitting in the big, important chair" was "the truth" and "[t]hings that really did happen." G.G. indicated she understood. The prosecutor questioned G.G. to determine whether she understood the difference between telling the truth and lying:

"[Prosecutor]: And I know the judge was asking you about your sweatshirt. If you were to sit on that chair and tell us you were wearing a yellow sweatshirt, would that be really something that's happened? Would that be truth?

"[G.G.]: No.

"[Prosecutor]: Right. So that wouldn't be okay to say.

"Would you agree with me?

"[G.G.]: Uh-uh. No.

[¶] . . . [¶]

"[Prosecutor]: Okay. So what I'm trying to ask you is whether you promise -- when you're sitting in that big, important chair, if everything you say is going to be the truth, only things that really happened.

"[G.G.]: Yes.

"[Prosecutor]: Okay. And if you were to sit in that chair and tell me you were wearing a yellow sweatshirt, that wouldn't be telling me the truth; is that right?

"[G.G.]: Lie.

12

"[Prosecutor]: Exactly.

"You promise you're going to tell the truth?

"[G.G.]: Yes.

"[Prosecutor]: So the judge was also telling you that if anybody asks you any questions in this room while you're sitting in that big, important chair, and you don't know the answer, it's okay to say 'I don't know.' Okay?

"[G.G.]: Okay.

"[Prosecutor]: And if anybody asks you a question in that big, important chair, and you don't remember the answer, that's okay. Okay?

"[G.G.]: Okay.

"[Prosecutor]: Or if I ask you a question and I use a funny word, and you don't really know what I mean, it's okay to say 'Lady, I don't know what you're talking about.'

"[G.G.]: Okay.

"[Prosecutor]: Okay. But we want you to make sure you're telling us things that really happened, and don't guess or make things up. Okay?

"[G.G.]: Okay."

In response to the prosecutor's questions, G.G. said how old she was and talked about school and with whom she was living at the time of trial. G.G. testified she used to live with her father in Santa Ana. When the prosecutor asked G.G. to look around the courtroom, G.G. stated she wanted to go to the bathroom. The court released the jurors for their morning break and permitted G.G. to go to the bathroom.

During the break, defense counsel moved to disqualify G.G. as a witness, arguing she was confused and struggling with the concepts of the truth and a lie. Articulating the basis for his motion, defense counsel stated, "I think [on] more than one occasion when asked if she knows the difference between a lie and a truth, she pauses for a very long time. Maybe the first time, I can understand that. But then each additional

13

pause has convinced me that she's having trouble with the concept." Defense counsel further asserted some of G.G.'s answers were not responsive to the questions asked.

The prosecutor responded G.G.'s answers showed she did not have difficulty understanding the concepts of telling the truth and only talking about things that really happened but she did have difficulty with certain words. The prosecutor pointed out when G.G. was given examples of a truth and a lie, she was able to identify each and G.G. indicated she understood she needed to say things that were true and really happened.

After referencing Evidence Code sections 700 and 701,[3] which govern witness competency, the court denied the defense motion. Explaining its reasoning, the court stated, "There was some ambiguity with her, and I think some -- because of her age, an inability to express herself about her understanding. I was left with the feeling that she understood that she has to tell the truth." However, the court indicated "cross-examination might be fodder for" the defense to make the motion again.

When the prosecutor resumed her direct examination, G.G. answered a few questions about Mother. The prosecutor asked G.G. if she saw her father in the courtroom when she looked around, and G.G. responded, "No." G.G. answered she could not remember to several of the prosecutor's questions: she could not remember when or why she stopped living with her father; whether she slept in the same bed with him; whether he took off her clothes; whether her father hurt her at night when she was in bed; whether Auntie took care of her while she lived with her father; or whether she told Auntie that her father hurt her. However, G.G. did remember Auntie and spending time with her. She also remembered talking to a police officer with Auntie but did not remember if she told the officer her father hurt her private parts. Nor did G.G. remember her CAST interview, but she recently had seen a video of it.

---

[3]      When reading Evidence Code section 701, the court misspoke and referred to it as Evidence Code section 702.

14

When asked if Auntie told her to say "bad things" about her father, G.G. answered, "Yes." At first, G.G. could not remember what Auntie told her to say, but then testified Auntie told her to tell the police officers her father hurt her private parts. The prosecutor asked G.G. whether her father actually hurt her private parts or if it was something that did not really happen and G.G. responded she did not remember. The prosecutor reminded G.G. that she had to talk about things that really happened and she could not say things that did not really happen. G.G. indicated she understood. The prosecutor asked G.G. if her father hurt her private parts or if her Auntie just told her to say that, and G.G. answered, "Hit my body parts."

After G.G. identified her private parts as places where she goes "pee pee" and "poo poo," the following exchange occurred:

"[Prosecutor]: Did your daddy ever touch your private parts, the part where you go pee pee or the part where you go poo poo?

"[G.G.]: Yes. Yes.

"[Prosecutor]: Are you saying that because that's what really happened? Or because [Auntie] told you to say that?

"[G.G.]: My [Auntie] told me.

"[Prosecutor]: Okay. Did your [Auntie] tell you to tell the truth, to say what really happened?

"[G.G.]: Yes.

"[Prosecutor]: Or did she tell you to tell people daddy touched your private parts?

"[G.G.]: Yes."

The prosecutor again reminded G.G. to make sure she only said things that really happened, and again, G.G. indicated she understood. The court excused the jury for another break when G.G. became very upset. When questioning resumed, the following exchange occurred between the prosecutor and G.G.:

15

"[Prosecutor]: [G.G.], did your daddy touch your private parts or is that a story that [Auntie] made up?

"[G.G.]: It's a story.

"[Prosecutor]: Okay. Did daddy touch your private parts?

"[G.G.]: Yes.

"[Prosecutor]: Okay. So when [Auntie] told you to tell the police, is that because it happened? Or because she was telling a lie? She made it up?

[¶] . . . [¶]

"[G.G.]: I don't know.

[¶] . . . [¶]

"[Prosecutor]: Regardless, forget anything Auntie [ ] said about daddy. Okay? Just you and me here. Forget [Auntie].

"Are you telling us that daddy touched your private parts because it really happened? Or it didn't really happen?

"[G.G.]: Happened.

"[Prosecutor]: Did anybody else touch your private parts?

"[G.G.]: No. Only my dad."

Under cross-examination, G.G. indicated she did not know if she would get in trouble or what would happen if she did not tell the truth. But she believed her father would get in trouble if she did not tell the truth. G.G. understood they were there for her to tell people what happened with her father. When defense counsel asked G.G. if she believed it was okay to guess when answering their questions, G.G. did not respond and stated she wanted to go to the bathroom. The court gave G.G. and the jurors another break.

After the break, cross-examination resumed:

"[Defense counsel]: When we left, I was trying to find out if you think it's okay to guess at the answers to the questions that you're being asked.

16

"[G.G.]: Yes.

"[Defense counsel]: So you think it's okay to guess at the answers?

"[G.G.]: No.

"[Defense counsel]: You have to help me understand. I'm a little confused. First you said 'yes'; then you said 'no.'

"Are you trying to figure out what's the right answer to the question right now?

"[G.G.]: No.

"[Defense counsel]: Okay. So which one is the answer you want to give us?

"[G.G.]: No.

"[Defense counsel]: No. Okay.

Are you -- it sounds like you're having trouble with your memory; is that right?

"[G.G.]: I don't know.

"[Defense counsel]: Okay. You've answered 'I don't know' a lot, right?

"[G.G.]: Yes."

After G.G. completed her testimony, the defense moved, outside the presence of the jury, to strike G.G.'s testimony on the ground she was not qualified as a witness. The defense argued G.G.'s testimony showed she did not understand the difference between a truth and a lie. The court denied the motion and explained its reasoning: "I did not take her testimony to support that she's incapable of her duty to tell the truth. I found there's sufficient evidence that she understands her duty to tell the truth. [¶] I'm not commenting on her credibility about the facts of the -- the alleged facts of the case . . . I think there was sufficient evidence on the record that she understands her duty to tell the truth and is capable of doing so."

17

C. *Analysis*

Solorzano asserts "it is evident" from the record G.G. "did not understand her duty to tell the truth as a witness and/or she was incapable of expressing herself concerning the matter so as to be understood." Initially, we note this claim is broader than the one he raised below. In the trial court, Solorzano argued G.G. should be disqualified from testifying because she was incapable of understanding her duty to tell the truth (Evid. Code, § 701, subd. (a)(2)); he did not assert she was incapable of expressing herself so as to be understood (Evid. Code, § 701, subd. (a)(1)), as a separate ground for disqualifying her as a witness. A witness competency issue is a "fact-based issue [that] presents an ideal circumstance for applying the forfeiture rule." (*Ana C., supra*, 204 Cal.App.4th at p. 1325.) Nevertheless, we need not decide whether Solorzano forfeited his challenge under Evidence Code section 701, subdivision (a)(1), as we address both portions of his claim on their merits to forestall a claim of ineffective assistance of trial counsel. (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1014.) Doing so, we conclude the trial court was within its discretion in permitting G.G. to testify.

The record does not support Solorzano's contention G.G. was incapable of communicating so as to be understood. G.G. was capable of answering questions presented to her regarding the matter before the court. Admittedly she had difficulty with some questions that were compound or complex, but she had the capacity to communicate and answer the questions asked of her. She understood she was there to tell people what happened with her father. G.G. answered questions about her age, school, who she previously lived with, who she was currently living with, where Mother lived, and spending time with Auntie. She also testified as to what she remembered about her father touching her private parts and talking to a police officer.

Solorzano relies on the fact G.G. was unable to identify him in the courtroom as support for his argument she was incapable of expressing herself regarding the matter. We afford this fact little, if any, significance. By the time of trial, it had been

18

more than two and a half years since G.G. had seen her father, and there is no indication in the record as to whether or how much Solorzano's appearance changed in this interim.

Solorzano also complains "most of [G.G.'s] testimony was comprised of responding 'yes,' 'no,' 'I don't know,' or 'I don't remember' to leading questions." It was challenging for either counsel to get a lot of information from G.G. But her difficulties in remembering the events from 32 months prior were credibility issues for the jury to consider. Her "failure to remember aspects of the subject of the testimony" does not disqualify her as a witness. (*People v. Mincey* (1992) 2 Cal.4th 408, 444 (*Mincey*).) In *Mincey*, our Supreme Court was confronted with the issue of whether a five-year-old witness was competent to testify. (*Id.* at p. 443.) Concluding the trial court was within its discretion in finding the child competent, the Supreme Court stated, "[i]nconsistencies in testimony and a failure to remember aspects of the subject of the testimony . . . do not disqualify a witness. [Citation.] They present questions of credibility for resolution by the trier of fact. [Citations.]" (*Id.* at pp. 444-445.)

As additional support for his argument G.G. was incapable of expressing herself regarding the matter, Solorzano points to G.G.'s inconsistent answers regarding whether her father touched her private parts or whether it was a story made up by Auntie. "But contradictory testimony does not suffice to show incapacity to understand the duty of truth, or to express oneself coherently." (*People v. Avila* (2006) 38 Cal.4th 491, 589.) Contradictions in G.G.'s testimony were for the jury to consider in evaluating her credibility. (*Id.* at p. 590.) On cross-examination, defense counsel emphasized G.G. gave inconsistent answers to a question and had answered several questions with "'I don't know.'" The deficiencies in G.G.'s capabilities as a witness were not hidden from the jury, "which was given an 'ample basis upon which to judge the reliability of [her statements].' [Citation.]" (*Flinner, supra*, 10 Cal.5th at p. 742.) These deficiencies, however, were not grounds for disqualifying G.G. as a witness. (See *People v. Lewis* (2001) 26 Cal.4th 334, 361 [concluding witness diagnosed as having intellect of seven-

19

year-old, who had "difficulty with complex questions and often responded in incomplete, sometimes nonsensical, sentences", was not disqualified from testifying].)

Nor does the record support Solorzano's contention the court abused its discretion by finding G.G. was able to understand her duty to tell the truth. When given examples by both the court and the prosecutor, G.G.'s responses showed she understood the difference between the truth and a lie. G.G. indicated she understood she had to tell the truth and promised to do so and only say things that really happened. The trial court had the opportunity to observe G.G. and her demeanor in responding to the questions. No abuse of discretion appears here. (See *Mincey, supra*, 2 Cal.4th at pp. 444-445 [concluding trial court did not abuse discretion in ruling five-year-old competent to testify after ascertaining she could distinguish between truth and falsity].)

We conclude the trial court did not abuse its discretion in finding G.G. competent to testify and letting the jury evaluate her credibility. Accordingly, we reject Solorzano's contention.

II. *Admission of Solorzano's Statements to the Police*

Solorzano contends statements he made during Corona's interview should have been suppressed because they resulted from police coercion and implied promises of leniency. The Attorney General argues Solorzano has forfeited his argument by failing to raise it below. We agree. Unless raised in the trial court, a "claim of involuntariness of defendant's statements and confession is not preserved for appeal. [Citations]." (*People v. Cruz* (2008) 44 Cal.4th 636, 669.) The issue must be raised below to give the parties an opportunity "'to fully litigate this theory'" and the trial court an "'opportunity to resolve material factual disputes and make necessary factual findings.' [Citation.]" (*Ibid.*) Thus, "a claim of involuntariness generally will not be addressed for the first time on appeal. [Citations.]" (*People v. Ray* (1996) 13 Cal.4th 313, 339.)

Anticipating the Attorney General's forfeiture argument, Solorzano asserts his trial counsel's failure to challenge the admission of his statements on voluntariness

20

grounds constitutes ineffective assistance in violation of his right to counsel under the federal and state Constitutions. "[A] defendant claiming ineffective assistance of [trial] counsel . . . must show both deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome." (*People v. Osband* (1996) 13 Cal.4th 622, 700 (*Osband*).)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Our record is silent as to why defense counsel did not challenge the admissibility of Solorzano's statements on involuntariness grounds. Thus, to determine whether there was a satisfactory explanation for counsel's omission, we assess whether such a challenge would have been futile. Doing so, we conclude seeking suppression of Solorzano's statements as involuntary would have been futile, and therefore, trial counsel did not render ineffective assistance. (*People v. Solomon* (2010) 49 Cal.4th 792, 843, fn. 24 ["The Sixth Amendment does not require counsel to raise futile motions"].)

A. *Applicable Law on Involuntary Confessions*

"The basic law is settled. A criminal conviction may not be founded upon an involuntary confession. [Citation.] 'The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.]'" (*People v. Williams* (2010) 49 Cal.4th 405, 436.) "The test for the voluntariness of a custodial statement is whether the statement is '"the product of an essentially free and unconstrained choice"' or whether the defendant's '"will has been overborne and his capacity for self-determination critically impaired"' by coercion. [Citation.] No single factor is dispositive; 'rather courts consider the totality of [the]

21

circumstances.' [Citations.] Relevant considerations include "'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health."' [Citations.]" (*People v. Cunningham* (2015) 61 Cal.4th 609, 642-643 (*Cunningham*).)

Our Supreme Court has explained "'[o]nce a suspect has been properly advised of his rights, he may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect. . . . Yet in carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession. . . . [The police] are authorized to interview suspects who have been advised of their rights, but they must conduct the interview without the undue pressure that amounts to coercion and without the dishonesty and trickery that amounts to false promise.' [Citation.]" (*People v. Holloway* (2004) 33 Cal.4th 96, 115 (*Holloway*).) "'In assessing allegedly coercive police tactics, "[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable."' [Citations.]" (*Cunningham, supra*, 61 Cal.4th at p. 643.)

B. *Analysis*

Solorzano contends the totality of the circumstances demonstrates he "was in a psychologically coercive situation that overbore his will and pressured him into making involuntary admissions." He asserts his involuntary statements would have been suppressed if his counsel had objected to their admission. We disagree. Considering the totality of the interrogation's circumstances, we do not reach the conclusion Solorzano's statements were the involuntary product of police coercion.

22

The interview took place in a room in the booking area of the men's central jail. Although there were three law enforcement officers in the room with Solorzano, only Corona questioned him. Corona's partner, Detective Perez, did not ask Solorzano any questions, and the other officer simply escorted Solorzano into the room, stood on the opposite side of the room during the interrogation, and did not participate. There was no physical display of force during the interview, and Solorzano was not threatened with harm. The interview was not that long, lasting less than an hour. We have listened to the recording of the interrogation, and Corona did not use an overly harsh tone in questioning Solorzano. Thus, the setting was not overbearing, and the interrogation was not unusually lengthy. (See *People v. DePriest* (2007) 42 Cal.4th 1, 35 [upholding trial court's voluntariness decision where "interview lasted only 45 minutes as opposed to several hours" in jail interview room].)

Consideration of Solorzano's traits does not aid his claim of involuntariness either; although some support his claim, others undermine it. Solorzano was from a foreign country, but this was his second time living in the United States. He previously lived in the United States for a year before being deported. He had little, if any, experience with our criminal justice system before the interrogation as he no prior convictions, only a citation for Vehicle Code violations. As for his education, the record indicates he completed the 11th grade. He was 28 years old at the time of the interview, and there is no indication he was of low intelligence or easily susceptible to suggestion.

Solorzano contends his free will was overborne because Corona "falsely and repeatedly told [him] that his saliva had been found on [G.G.'s] vaginal area." Ruses are a permissible tactic during an interrogation. "The mere fact that the police lie to a suspect during questioning does not render the suspect's statements involuntary. [Citation.] 'Police officers are . . . at liberty to utilize deceptive stratagems to trick a guilty person into confessing. The cases from California and federal courts validating

23

such tactics are legion.' [Citation.]" (*People v. James* (2021) 70 Cal.App.5th 1031, 1044 (*James*).)

Solorzano also complains Corona "repeatedly accused [him] of lying, suggested [Solorzano] made a mistake, insisted [he] was guilty of inappropriately touching his daughter, frequently cut-off [Solorzano's] responses, and relentlessly continued his accusations until he obtained the responses he wanted to hear." These tactics are also permissible. Suggestions the incident might have been a mistake or an accident are not considered coercive. "[T]hey merely suggest[ ] possible explanations of the events and offer[ ] defendant an opportunity to provide the details of the crime." (*People v. Carrington* (2009) 47 Cal.4th 145, 171.) Interrogators are also free to challenge the defendant's story and confront him with facts that appear to contradict his version. (*Holloway, supra*, 33 Cal.4th at p. 115.)

Solorzano further asserts Corona made implicit promises of leniency when Corona told him if he was honest, Corona would relay that information to the District Attorney. "'[M]ere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. . . . Thus, "[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made. [Citation.] On the other hand, "if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible . . . ."' [Citations.]" (*Holloway, supra*, 33 Cal.4th at p. 115.)

Merely urging Solorzano to tell the truth because it would look better for him would have been permissible. But we find troubling Corona's admission at trial he was trying to imply he had "some way to talk to the" District Attorney to make it easier

24

on Solorzano if he confessed. Nevertheless, it does not appear this enticement overrode Solorzano's will to resist. (*Cunningham, supra*, 61 Cal.4th at p. 643 ["A confession is involuntary only if the coercive police conduct at issue and the defendant's statement are causally related"].) Corona's references to being able to tell the District Attorney Solorzano was honest occurred in the first half of the interview. After these statements, Solorzano continued to maintain his innocence for sometime. It was later in the interrogation before Solorzano even admitted touching and kissing G.G. when cleaning and checking her for a urinary tract infection and accidentally touching her while playing. It appears Solorzano was motivated by a desire to provide a mitigating explanation and not by an implied promise of leniency by Corona. Considering the totality of the circumstances in the record, we conclude Solorzano's confession was voluntary and not the product of coercion.

Therefore, we conclude trial counsel's performance was not deficient for failing to file a futile motion to suppress Solorzano's statements on involuntariness grounds. (*James, supra*, 70 Cal.App.5th at p. 1046.) Even assuming counsel's performance was deficient, we are not persuaded Solorzano would have enjoyed a more favorable outcome if his statements had been suppressed. (*Osband, supra*, 13 Cal.4th at p. 700.) The video of G.G.'s CAST interview and the forensic testimony presented at trial provided overwhelming evidence of Solorzano's guilt. Accordingly, Solorzano's claim of ineffective assistance of counsel also fails.

III. *Prosecutorial Error*

Solorzano contends his convictions in counts 3 and 5 must be reversed due to prosecutorial error in closing argument. He asserts the prosecutor misstated the law "when she told the jury there was no mental state or intent required for the offenses

25

charged in counts 3[ ] and 5."[4] In response, the Attorney General asserts Solorzano forfeited his claim by failing to request an admonition below, and if not forfeited, Solorzano's claim should be rejected because the prosecutor properly argued the law. We conclude Solorzano preserved his claim by objecting below, but there was no prejudicial prosecutorial error.

A. *Trial Court Proceedings*

Prior to closing arguments, the court instructed the jury on the charged offenses. As to the charge of sexual intercourse with a child 10 years of age or younger in count 3 (§ 288.7, subd. (a)), the court instructed the jury with CALCRIM No. 1127.[5] For the charge of oral copulation with a child 10 years of age or younger in count 5 (§ 288.7, subd. (b)), the court instructed the jury with CALCRIM No. 1128.[6] The jury was also instructed with CALCRIM No. 252, which explained both crimes required

---

[4]      The jury found Solorzano not guilty of the offense charged in count 4. Therefore, we do not address his contention of prosecutorial error concerning this count.

[5]      As given to the jury, CALCRIM No. 1127 stated: "The defendant is charged in Count[ ] 3 . . . with engaging in sexual intercourse with a child 10 years of age or younger in violation of . . . section 288.7(a). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant engaged in an act of sexual intercourse with [G.G.]; [¶] 2. When the defendant did so, [G.G.] was 10 years of age or younger; [¶] 3. At the time of the act, the defendant was at least 18 years old. [¶] Under the law, a person becomes one year older as soon as the first minute of his or her birthday has begun. [¶] *Sexual intercourse* means any penetration, no matter how slight, of the vagina or genitalia by the penis. Ejaculation is not required. [¶] *Sexual penetration* of the genital opening refers to penetration of the labia majora, not vagina."

[6]      As given, CALCRIM No. 1128 read as follows: "The defendant is charged in Count 5 with engaging in oral copulation with a child 10 years of age or younger in violation of . . . section 288.7(b). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant engaged in an act of oral copulation with [G.G.]; [¶] 2. When the defendant did so, [G.G.] was 10 years of age or younger; [¶] 3. At the time of the act, the defendant was at least 18 years old. [¶] *Oral copulation* is any contact, no matter how slight, between the mouth of one person and the sexual organ or anus of another person. Penetration is not required."

"proof of the union, or joint operation, of act and wrongful intent." CALCRIM No. 252 informed the jurors the offenses in counts 3 and 5 were general intent crimes and to convict Solorzano of these charges, they had to find he not only committed the prohibited acts but did "so with wrongful intent." CALCRIM No. 252 explained to the jury: "A person acts with wrongful intent when he or she intentionally does a prohibited act; however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime or allegation."

In her closing argument, the prosecutor addressed the counts in the order charged, first discussing the elements of the lewd act charges in counts 1 and 2.[7] Addressing the intent element, the prosecutor explained the lewd act offenses required proof "[t]he defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child." Arguing the elements of the lewd act charges had been satisfied, the prosecutor stated: "Now, again, any touching. Doesn't have to be lewd. And willfully is not the same thing as intentionally. It just means he wasn't asleep. He wasn't drunk. He wasn't falling into her vagina in some fashion. [¶] Actually arousing is not required. And I point this out simply because you could find maybe he didn't ejaculate or he didn't have an erection. But if he's touching her with sexual intent despite that, it's still a lewd act." Before moving on to the other charges, the prosecutor reiterated the lewd act offenses required evidence of "sexually intended" touching while G.G. was under the age of 14 years.

The prosecutor segued into a discussion of the elements of the sexual intercourse charges in counts 3 and 4 and argued: "All this charge requires is that you be convinced beyond a reasonable doubt that the defendant engaged in sexual intercourse

---

[7]     Solorzano does not contend the prosecutor erred in discussing the elements of the lewd act offenses. Nevertheless, we quote this portion of the prosecutor's argument to provide context for the prosecutor's argument that immediately followed, in which Solorzano contends the prosecutor committed error.

with [G.G.]. [¶] Now, sexual intercourse -- we all think we know what that means, right? But the law has a very specific definition that I need to point out to you. And that's 'any penetration, however slight, of the genital opening by the other person.' [¶] . . . [¶] And if you believe beyond a reasonable doubt that the defendant's penis passed that outer point of [G.G.]'s vagina and had sexual intercourse with her, you can convict him of this charge. Because the only other requirements are that she was under 10, which we all know, and that he was over 18. There's no sexual intent. There is no 'Read his mind.' Did his penis pass that point is the question for you on these two charges, and did it happen more than one time." Addressing the oral copulation charge in count 5, the prosecutor asserted, "For oral copulation, same exact concept. The act of oral copulation. She's under 10; he's over 18. And oral copulation is any contact, no matter how slight, with a sexual organ or mouth of one person and the sexual organ or anus of the other. No penetration for this one required. No intent. No mental state required."

The defense objected the prosecutor misstated the law, but the court overruled the objection. Returning to her argument, the prosecutor stated, "This is not specific intent. He intended to get aroused by touching her vagina. This isn't a lewd act. This is any contact with his mouth and her vagina while she's under 10 and he's over 18."

## B. *Forfeiture*

The Attorney General contends Solorzano forfeited his prosecutorial error claim by failing to request an admonition after lodging his objection. "Generally, a claim of prosecutorial misconduct is preserved for appeal only if the defendant objects in the trial court and requests an admonition, or if an admonition would not have cured the prejudice caused by the prosecutor's misconduct. [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.) Solorzano contends his claim should not be deemed forfeited because he objected to the prosecutor's argument and the trial court immediately

28

overruled his objection, therefore requesting a curative admonition would have been futile.  We agree with Solorzano.

"Forfeiture for failure to request an admonition will . . . not apply where the trial court immediately overruled the objection to the alleged misconduct, leaving defendant without an opportunity to request an admonition."  (*People v. Panah* (2005) 35 Cal.4th 395, 462.)  Here, Solorzano objected the prosecutor was misstating the law, and the trial court immediately overruled the defense objection, signaling it found the prosecutor's argument appropriate.  Thus, Solorzano did not forfeit his prosecutorial error claim by failing to request an admonition under these circumstances.[8]

C.  *Applicable Law*

"""A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.'  [Citations.]  In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'  [Citation.]  A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'""  [Citation.]"  (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894.)

"[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements [citation]."  (*People v. Marshall* (1996) 13 Cal.4th 799, 831.)  A defendant asserting a prosecutor erred by misstating the law "'must . . . establish a reasonable likelihood the jury construed the remarks in an objectionable fashion.'  [Citations.]"  (*People v. Fayed* (2020) 9 Cal.5th 147, 204.)

---

[8]     Because we address Solorzano's claim on its merits and conclude there was no prosecutorial error, we do not separately address his alternative claim his counsel's failure to request an admonition constituted ineffective assistance.

Reviewing a claim of prosecutorial error in closing argument, "we do not view the prosecutor's remarks in isolation but rather 'in the context of the argument as a whole.' [Citation.]" (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 513.) "'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' [Citation.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 772.)

D. *Analysis*

Solorzano contends the prosecutor erred "by misstating the law when she informed the jury that the offenses charged in counts 3[ ] and 5 do not require any mental state or intent, and all that is required is proof of the elements (as set forth in CALCRIM No[s]. 1127 and 1128)." Solorzano asserts this portion of the prosecutor's argument lowered the prosecution's burden of proof and the jury may have convicted him of the offenses without finding he acted with wrongful intent. We are not persuaded.

Considering the prosecutor's whole argument, it is not reasonably likely the jury construed the prosecutor's remarks as absolving the prosecution of proving Solorzano acted with wrongful intent for the charges in counts 3 and 5. When the prosecutor made the challenged statements of "no sexual intent," "no intent," and "no mental state required," the prosecutor was contrasting the mens rea element of the sexual intercourse and oral copulation charges in counts 3 and 5 with that in the lewd act offenses in counts 1 and 2. Granted the prosecutor's statements of "no intent" and "no mental state required" were inartful, but after the defense objected, the prosecutor clarified she meant the charges in counts 3 and 5 were not lewd act offenses and there was no specific intent requirement.

Near the end of her closing argument, the prosecutor implored the jury to look at the instructions and the required elements for the charges. The jury was properly instructed on the elements of the charges and on the required proof of union of act and wrongful intent (CALCRIM No. 252). Solorzano does not contend otherwise. We

30

presume the jury followed the court's instructions and treated "the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.]" (*Osband, supra*, 13 Cal.4th at p. 717.) "Indeed, the jury was instructed that, to the extent the law as given by the trial court conflicted with the description of the law as given by the attorneys, the jury was to follow the court's instructions." (*People v. Boyette* (2002) 29 Cal.4th 381, 436.) Accordingly, Solorzano's contention of prosecutorial error fails.

IV. *The Sentencing Minute Order and Abstract of Judgment Must be Corrected*

Solorzano identifies a clerical error contained in both the court's sentencing minute order and abstract of judgment and requests these documents be corrected to accurately reflect the trial court's oral pronouncement of judgment. The Attorney General agrees the clerical errors should be corrected, as do we.

At sentencing, the trial court imposed a six-year term on count 1 but stayed the sentence under section 654. Rightly, the court did not indicate the stayed sentence was to be served concurrent to the non-stayed terms. (*People v. Jones* (2012) 54 Cal.4th 350, 353 ["the imposition of concurrent sentences is precluded by section 654"].) However, both the sentencing minute order and abstract of judgment state the court imposed a concurrent sentence on count 1 that was stayed under section 654. "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls. [Citations.]" (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) Pursuant to our power to correct clerical errors in the record (*Jones, supra*, 54 Cal.4th at p. 89), we order the sentencing minute order and abstract of judgment be amended to conform to the court's oral pronouncement of judgment by omitting the notation to a concurrent sentence on count 1.

## DISPOSITION

The clerk of the superior court is directed to prepare an amended abstract of judgment and sentencing minute order omitting the reference to a concurrent sentence imposed on count 1. Upon doing so, the superior court is directed to forward certified

31

copies of the amended documents to the Department of Corrections and Rehabilitation, Division of Adult Operations.  In all other respects, the judgment is affirmed.



O'LEARY, P. J.

WE CONCUR:


MOORE, J.


MARKS, J.*

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.